CIVIL ACTION NO. 11-382-DLB

MYSTI BREEZ LEATH, deceased, by her next of kin,
STEVE and TINA LEATH                                              PLAINTIFF

vs.                    MEMORANDUM OPINION AND ORDER

CITY OF KNOXVILLE, et al.                                         DEFENDANTS

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiffs bring this civil rights action under 42 U.S.C. § 1983 on behalf of their deceased daughter against the City of Knoxville and two Knoxville Police Officers. Plaintiffs assert that the officers, acting under the color of state law, were deliberately indifferent to their daughter's serious medical need in violation of her constitutional rights. Officer Randall Smith has moved for summary judgment on this claim (Doc. # 8), which has been fully briefed (Docs. # 26, 28), and is ripe for review. For the following reasons, the Court will **grant** Officer Smith's motion for summary judgment.

I.   **FACTUAL BACKGROUND**

In the early morning hours of August 15, 2010, Mysti Leath, Jessica Moore and another individual returned to an apartment at 525 Renford Road in Knoxville, Tennessee from a night of partying that included drinking alcohol, and taking Oxycontin and Xanax. (Doc. # 24-1). At some point after they returned, Leath and Moore began fighting. Leath's dog—a pit bull—intervened and bit Moore on the arm, causing significant bleeding. Thereafter, Monica Garcia entered the apartment and confronted Leath; Garcia knocked

her to the floor, straddled her, and began choking her. With her hands around Leath's neck, Garcia threatened, "that's it, I'm going to kill you." (*Id.* at ¶ 5).

At approximately 4:45 a.m., City of Knoxville Police Officers Defendants Randall Smith and Jason Artymovich responded to a disturbance call at the apartment. Upon arriving, the officers found Leath, Moore, Garcia and a fourth individual—Melanie Goin—inside the apartment. It was apparent from bumps and marks on Leath's and Moore's body that they had been fighting. However, after taking statements from each of the individuals present, the officers were unable to determine who was the initial aggressor.[1] The officers, therefore, chose not to make an arrest.[2]

During the course of the officers' inquiry, they determined that Leath was not on the lease of the apartment and did not otherwise have a legal right to be there. Therefore, they advised Leath that she had to leave. But because Leath was intoxicated and did not have a valid driver's license, Officer Smith "*offered* to transport Leath to another destination that would be safe for her." (Doc. # 8-1 at ¶ 4) (emphasis added). Leath accepted the offer.

At approximately 5:22 a.m., Leath "*voluntarily* entered the backseat of Officer Smith's patrol car and they proceeded towards [her] requested destination." (*Id.* at ¶ 5) (emphasis added). Audio from the seventeen minute ride to Leath's parents' residence was captured by the dash camera in Officer Smith's vehicle. As Officer Smith was pulling

---

[1] The substance of only one statement made to officers is contained in the record. Moore "told the officers that [she] had been bitten by a dog belonging to [Leath] and [Garcia] and [she] showed them [her] bleeding wound." (Doc. # 24-1 at ¶ 8). While the Court recognizes that the statement is in the record, the Court finds that the statement has no relevance to the pending motion for summary judgment.

[2] According to Ms. Moore, the officers were "quite aloof and nonchalant" during their exchange with the females. (Doc. # 24-1 at ¶ 10). Moore described them as "smirking, giggling, [and] smiling" with "their body language inicat[ing] . . . that they had little concern for the preceding events." (*Id.*). The officers "expressed no interest in [Moore's] physical condition or that of [Leath], or [Garcia] for that matter." (*Id.*). Rather, the officers "were clearly entertained by an apartment full of drunk lesbian women." (*Id.*).

2

out of the apartment complex, Leath asked the officer "where your generosity came from this evening?" — apparently referring to the officer's decision not to arrest her. (*See* Doc. # 10 at 5:23:20 a.m.). Officer Smith explained that he was "sure [Moore] had a lot do with that fight just as much as you did. That's why I didn't want to take you to jail and not take her." (*See id.* at 5:23:35 a.m.). Leath responded, "well I understand that, and I appreciate that." (*See id.* at 5:23:45 a.m.).

Over the course of the seventeen minute ride, Officer Smith and Leath discussed a variety of topics. Leath asked Officer Smith to roll down the rear window; he obliged. Officer Smith then asked Leath about her previous arrests (*See id.* at 5:24:53 a.m.), prompting a five-minute conversation between the two about Leath's criminal history. After a minute-and-a-half lull in the conversation, Leath sought advice from Officer Smith: she asked whether her friend, Monica Garcia, committed theft of an automobile by refusing to give her back the keys to her vehicle. (*See id.* at 5:31:15 a.m.). Officer Smith responded to Leath's question and then turned the conversation to Leath's upbringing, including where she grew up and her relationship with her parents.

As Officer Smith neared Leath's parents' residence, he called on Leath to provide directions. First, though, he asked her whether her parents were home, to which Leath responded "yes sir." (*See id.* at 5:33:40 a.m.). Leath then told Officer Smith to stay in his current lane and "take a left up here at this light, right here at this light." (*See id.* at 5:34:07 a.m.). While Officer Smith sat at the red light waiting to take a left, Leath told the officer that her parents would not be happy with her when she got home. (*See id.* at 5:34:15 a.m.). Officer Smith then took a left and proceeded to drive for approximately two minutes before Leath instructed him to turn right. (*See id.* at 5:36:30 a.m.). Leath then advised that

3

the next turn would be in approximately one-quarter mile. Leath, however, failed to tell Officer Smith to make the turn because, as she explained, Officer Smith "had me talkin'." (*See id.* at 5:37:55 a.m.). Leath quickly realized the mistake and had Officer Smith turn around. After driving a short distance—which took no more than twenty seconds—Leath instructed Officer Smith to turn left into her parents' neighborhood and directed him to their house.

Officer Smith and Leath arrived at her parents' residence at approximately 5:39 a.m. Leath knocked on the front door and rang the doorbell, but her parents did not answer. She explained to Officer Smith that her parents likely could not hear her because her father suffered from sleep apnea and her mother took mediation for insomnia. She proposed that she would try to call her parents to wake them. (*See id.* at 5:44:03 a.m.). Officer Smith responded, "Call 'em, I can't have you wandering out here on the street because you've been drinking." (*See id.* at 5:44:05 a.m.). Rather than call, Leath promised Officer Smith that she could use a spare key hidden on the side of the residence to get inside. She also promised, "I won't be out here, sir" (*Id.* at 5:44:18 a.m.), suggesting that she would not be out on the street. Satisfied with her promises, Officer Smith returned to his police cruiser and drove away at 5:45 a.m. During his entire time with Leath, Officer Smith never placed her in handcuffs, advised her that she was under arrest, or charged her with a crime.

Approximately forty-five minutes after Officer Smith departed, Leath was killed in a tragic single-vehicle accident.[3] At the time, she was a passenger in her own vehicle driven

---

[3] What happened between 5:45 a.m. and 6:30 a.m. is unclear from the record. The only evidence that shows what might have happened comes from an affidavit of Christopher Ahlers, which was based on his observations of the Leaths' residence the following morning. According to the affidavit, Ahlers arrived at the Leaths' residence during the day-light hours on July 15, 2010. He was a friend of the Leaths who was caring for their dogs while they were away on vacation. When he arrived, Ahlers found two new dents in a

4

by Monica Garcia. According to a Tennessee Uniform Traffic Crash Report, Garcia ran the vehicle off the road and crashed head-first into a tree. (Doc. # 8-4). The report listed a number of factors that contributed to the wreck: Garcia had been drinking, Leath somehow interfered with Garcia's driving, and Garcia was reckless or negligent in her driving. (*Id.*). Leath was twenty-three years old at the time of her death (*See* Doc. # 10 at 5:37:30 a.m.).

As a result of the foregoing, Mysti Leath's parents, Steve and Tina Leath, filed this § 1983 action on her behalf against the City of Knoxville, as well as Officers Jason Artymovich and Randall Smith in both their individual and official capacities. The Complaint alleges that the officers, acting under the color of state law, were deliberately indifferent to Mysti Leath's serious medical needs. Additionally, the Complaint alleges that the City of Knoxville failed to supervise, train and control the officers, which amounted to a deliberate indifference to and reckless disregard for Mysti Leath's constitutional rights.

## II.     ANALYSIS

### A.     Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The "moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). The

---

pickup truck parked in the driveway; two blue contact lenses on the driveway; gouge marks on the gate to the backyard; a purse, pill bottles, a debit card, identification card, and earring thrown about the backyard.

moving party may meet this burden by demonstrating the absence of evidence concerning an essential element of the nonmovant's claim on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has satisfied the burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, it must produce specific facts showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). In doing so, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

### B. Deliberate Indifference to a Serious Medical Need

Officer Smith argues he is entitled to summary judgment on the lone claim against him in Plaintiffs Complaint: "Defendant[ ] . . . Smith acted under color of state law and violated [Leath's] clearly established rights under the United States Constitution and were deliberately indifferent to the Plaintiffs' decedent's serious medical needs." (Doc. # 1 at ¶ 12). In their complaint however, Plaintiffs have not specifically pled which Constitutional Amendment provides this right. Because Plaintiff was not incarcerated at the time of the events involved herein, Plaintiffs must be asserting a substantive due process claim under the Fourteenth Amendment challenging the medical care that Officer Smith provided/or failed to provide to Leath. *See City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239,

243 (1983) (recognizing that the Fourteenth Amendment, and not the Eighth Amendment, requires the government to provide for the serious medical needs of pretrial detainees). Plaintiffs' claim will be addressed accordingly.

A pretrial detainee's substantive due process rights are violated if a state official is deliberately indifferent to the detainee's need for medical attention. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004). This right, though, is only afforded to those in custody. *Baker v. City of Detroit*, 217 F. App'x 491, 494-95 (6th Cir. 2007); *Jones v. Union County, TN*, 296 F.3d 417, 427-28 (6th Cir. 2002). The government is under no affirmative obligation to care for the life, liberty and property of free citizens, with limited exception. *DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189, 196 (1989).

Here, Leath was never in custody in the early-morning hours of August 15, 2010. "The overarching prerequisite for custody is an affirmative act that restrains the ability of an individual to act on [her] own behalf." *Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005). None of the facts of-record remotely suggest that Officer Smith, or any other officer, restrained Leath in any way. Rather, the record evidence indicates that Leath was told she had to leave the apartment; Officer Smith offered to take her wherever she wanted to go; Leath accepted the offer and asked Officer Smith to take her to her parents' residence; she voluntarily entered Officer Smith's vehicle; and she was never placed in handcuffs or otherwise restrained. In fact, Leath's own statements to Officer Smith indicate that she entered the officer's vehicle under her own free will. Shortly after getting in the vehicle, she asked Officer Smith "where [his] generosity came from this evening?" (*See* Doc. # 10 at 5:23:20 a.m.). Officer Smith responded by explaining why he chose not to arrest her,

7

prompting Leath to thank him.  These facts, construed in Plaintiffs' favor, do not show that police applied physical force to Leath, physically subdued her, or rendered her helpless. *See Cutlip v. City of Toledo*, 488 F. App'x 107, 114 (6th Cir. 2012).  As such, Leath was never in custody.

This conclusion is supported by the Sixth Circuit's decision in *Cartwright v. City of Marine City*, 336 F.3d 487 (6th Cir. 2000).  In *Cartwright*, officers stopped a man who was walking on the side of the road and offered him a ride. *Id.* at 489.  With the man in the car, the officers then drove to a nearby convenience store for a prisoner pickup. *Id.*  When they arrived at the store, officers advised the man that he would not be allowed to remain in the car with the prisoner unless he consented to a pat down. *Id.*  The man refused the pat down so the officers left him at the store and drove away. *Id.*  Approximately two hours later, the man was run over by a truck and found dead lying in the middle of a road. *Id.*  In addressing a substantive due process claim brought on behalf of the deceased man, the Sixth Circuit held that the man was not in custody because the officers "merely offered to give him a ride." *Id.* at 492.  The same can be said for the present case: Officer Smith merely offered to give Leath a ride.  And just as the Sixth Circuit found in *Cartwright*, Leath was not in custody here.

In disagreement with this conclusion, Plaintiffs argue that Leath was in custody because she "was directed by the officers . . .to leave." (Doc. # 26 at 3-4).  While that fact may be true, it says nothing about whether Leath was in custody.  Ordering an individual to leave a premises does not deprive the individual of her ability to care for herself and, therefore, does not amount to custody. *Foy v. City of Berea*, 58 F.3d 227, 232-33 (6th Cir. 1995).

Plaintiffs also argue that Leath was in custody because she was "kept in a moving police vehicle which the Court may take judicial notice is equipped with a screen separating the officer from the passenger, as well as doors that cannot be opened by the passenger." (Doc. # 26 at 3-4). This argument has two problems. First, Plaintiffs mischaracterize the evidence by stating that Leath was "*kept* in a moving police vehicle." (*Id.*) (emphasis added). "Kept" implies that she was held against her will. As previously explained, the facts do not support this connotation whatsoever; Leath entered the car voluntarily and appreciated Officer Smiths' generosity in taking her home. Second, despite Plaintiffs' bald assertion, the Court cannot take judicial notice of the fact that Officer Smith's vehicle was "equipped with a screen separating the officer from the passenger, as well as doors that cannot be opened by the passenger." (*Id.*). Judicial notice is only appropriate where a fact is universally known or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). While many police cruisers have the features Plaintiffs describe, they are not present in all cruisers. Because the fact is not necessarily true in this instance, it would be inappropriate for the Court to take judicial notice of the fact for purposes of adjudicating the summary judgment motion. In the end, neither of the "facts" proffered by Plaintiffs change the Court's conclusion that Leath was not in custody and, therefore, Officer Smith did not have a duty to provide for her medical needs.

Assuming, *arguendo*, that Leath was in custody, Officer Smith cannot be liable for being deliberately indifferent to her serious medical needs. "A constitutional claim for denial of medical care has objective and subjective components." *Blackmore v. Kalamazoo Cnty*, 390 F.3d 890, 895 (6th Cir. 2004). "The objective component requires the existence of a

9

'sufficiently serious' medical need." *Id.* (quoting *Farmer v. Breenan*, 511 U.S. 825, 834 (1994)). "In contrast, the subjective component requires a plaintiff to allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded the harm." *Phillips v. Roane Cnty. Tenn.*, 534 F.3d 531, 540 (6th Cir. 2008). Without expressing an opinion on the objective component, Plaintiffs have failed to put forth evidence to satisfy the subjective component of their deliberate indifference claim.

At best, Plaintiffs have established that Leath was intoxicated at the time of her encounter with Officer Smith. According to the affidavit of Ms. Jessica Moore, an individual with Leath earlier in the evening, Leath had consumed several shots of alcohol and Oxycontin and/or Xanax at some point during the night. However, despite consuming alcohol and drugs, she engaged in a lengthy conversation with Officer Smith, was able to intelligently respond to questions, and successfully guided Officer Smith to her parents' residence. In short, Leath's responsive behavior would have given Officer Smith no indication that she was intoxicated to the point that she required medical care.

In a factually analogous case, the Sixth Circuit has held that intoxication by itself is insufficient to put an officer on notice that an individual needs medical attention. In *Meier v. County of Presque Isle*, an individual sued police officers for being deliberately indifferent to his serious medical needs by failing to take him to the hospital for his intoxication. 376 F. App'x 524, 529 (6th Cir. 2010). The officer knew that the individual had a blood alcohol content of 0.31, which the officer described as "pretty high." *Id.* The Sixth Circuit held that the individual's "intoxication by itself–even at the extreme level indicated by the BAC–was insufficient to put [the officer] on notice that [the individual] needed medical attention." *Id.*

10

Case 3:11-cv-00382-DLB-HBG   Document 30   Filed 09/25/13   Page 10 of 18   PageID #: 167

This was particularly so, the court explained, because the individual "cooperated, communicated effectively, and walked unassisted." *Id.*

The Sixth Circuit's decision in *Meier* is both applicable and persuasive. Unlike the officer in *Meier*, Officer Smith never knew Leath's blood alcohol content. While the record indicates he knew Leath had been drinking, there is no indication that Officer Smith knew how much alcohol or drugs she had consumed. Nonetheless, as in *Meier*, Leath was cooperative and communicated effectively, and she gave no indication that she needed medical attention.

Plaintiffs attempt to rebut this conclusion with Officer Smith's own statement. As he and Leath were standing outside her parents' residence, Officer Smith said, "I can't have you wandering out here on the street because you've been drinking." (*See id.* at 5:44:05 a.m.). While this statement shows that he had some concern for her "wandering" the street, it does not show a subjective recognition that Leath needed medical care. Ultimately, Plaintiffs have failed to establish the subjective component of their deliberate indifference claim. As such, Officer Smith is entitled to judgment as a matter of law.

### C. Substantive Due Process Claim Under Exceptions to *Deshaney*

Although Plaintiffs' Complaint only challenges Officer Smith's alleged deliberate indifference to Leath's serious medical needs, the parties' briefing suggests that Plaintiffs are also challenging Officer Smith's failure to protect Leath from being involved in the automobile accident that ultimately took her life. Like the deliberate-indifference-to-a-serious-medical-need claim, this, too, is a substantive due process claim. Facts alleged within the Complaint and developed during discovery support this latter claim, but the Complaint does not specifically raise it. Thus, it is questionable whether Plaintiffs would

even be entitled to recover on this failure-to-protect theory. However, assuming that the claim has been properly pled, the evidence of record does not establish that Officer Smith violated Leath's substantive due process rights in this regard.

In *DeShaney v. Winnebago County Department of Social Services*, the Supreme Court held that "[a]s a general matter . . . the State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." 489 U.S. 189, 197 (1989). This rule comes with two exceptions. The first exception -- recognized by the *DeShaney* Court — imposes upon the State the affirmative duty to protect an individual when the State has so restrained the liberty of the individual that it renders her unable to care for herself. *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006) (citing *DeShaney*, 489 U.S. at 200). The second exception—recognized by the Sixth Circuit based on dicta from *DeShaney*—imposes an affirmative duty on the State to protect an individual when it has caused or greatly increased the risk of harm to its citizens through its own affirmative acts. *Id.* Plaintiffs have failed to establish a constitutional violation under the first exception because, as the Court has previously held, *see supra* Part II(B), Leath was never in custody during the early morning hours of August 15, 2010. Thus, the Court's analysis will focus on the second exception, known as the "state created danger" exception. *See* Jones, 438 F.3d at 690.

The state created danger exception has three elements that Plaintiffs must establish: "(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's action placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions

12

specifically endangered the plaintiff." *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003). At a minimum, Plaintiffs have failed to establish the first and third elements.

### 1. Affirmative Act

In determining whether an officer engaged in an affirmative act, the Sixth Circuit instructs courts not to engage in the "metaphysical question of whether officer behavior amounts to affirmative conduct or not," but rather to consider "whether the victim was safer before the state action than [she] was after it." *Koulta v. Merciez*, 477 F.3d 442, 445-46 (6th Cir. 2007) (quotations omitted). Here, Officer Smith transported Leath from an apartment where she had just been in a fight to her parents' residence. During the fight, Garcia knocked Leath to the ground, choked her, and threatened to kill her. Leath sustained marks and bumps on her body as a result. There is no evidence that suggests Leath's parents' residence was more dangerous than the situation she faced at the apartment. In fact, there is no evidence that the residence was dangerous at all.

Plaintiffs disagree with the Court's conclusion that Officer Smith did not leave Leath in a more dangerous situation. In support, they rely on Officer Smith's own statement to Leath that "I can't have you wandering out here on the street because you've been drinking" (*See id.* at 5:44:05 a.m.) to show that she was left in a dangerous environment. But Plaintiffs' reliance on Officer Smith's statement is misplaced. At best, it shows that Leath was potentially subject to harm if she was left to walk on the street. That, though, was not the dangerous condition that caused her injury; she was killed after deciding to get in a vehicle with an intoxicated driver.

The problem with Plaintiffs' claim is that they attempt to hold Officer Smith accountable for a danger that he did not create. Officer Smith left Leath at her parents'

13

residence after Leath assured him that her parents were home and she could gain entry with a spare key hidden in the backyard. Thereafter, Leath made the decision to get in the vehicle with Garcia, who was apparently intoxicated. Officer Smith had nothing to do with Leath's subsequent decision to ride with Garcia or Garcia's decision to drive while intoxicated; he did not force Leath to ride in the vehicle with Garcia nor did he leave her with no other option but to ride with Garcia. Moreover, if Leath needed a ride, none of Officer Smith's actions prevented her from calling a sober driver. Therefore, Officer Smith did not cause or increase the risk that Leath would be exposed to the harm that ultimately killed her.

This conclusion is supported by the Sixth Circuit's decision in *Koulta v. Merciez*, 477 F.3d 442 (6th Cir. 2007). There, officers responded to a woman's call that an unwanted person was on her property. *Id.* at 444. Upon arriving, the suspect explained why she was on the property and advised police that she had drunk a 40-ounce bottle of malt liquor earlier in the evening. *Id.* The officers eventually ordered the suspect to leave the premises. *Id.* The suspect drove away and, shortly thereafter, crashed into Sami Koulta's vehicle, killing him instantly. *Id.* Koulta's estate sued the police under the state-created danger exception to *DeShaney*. *Id.* at 445.

The Sixth Circuit affirmed summary judgment in favor of the officers, finding that the officers had not created or increased the risk that the suspect would drive and injure someone. *Id.* The court found that the officers only told the suspect to "go home" but never *required* her to drive if she lacked the capacity to do so. *Id* at 446. Additionally, the court held that nothing prevented the suspect from "driving down the block, then calling a cab or waiting to drive the rest of the way home or from asking the officers for assistance

14

in getting home." *Id.* The same can be said for the case *sub judice*: Officer Smith never required Leath to ride with an intoxicated driver nor was she prevented from finding an alternative, safer driver.

The record unfortunately suggests that Leath's own actions may have contributed to her death. Leath made her own independent decision to ride with Garcia after a night of drinking and consuming drugs. Additionally, the police report from the accident indicates that Leath somehow interfered with Garcia's ability to drive, which played a part in causing the fatal accident. (*See* Doc. # 8-4 at 2). Simply put, Officer Smith cannot be held liable for failing to protect Leath from acting on her own poor choices.

### 2. Knew or Should Have Known

Plaintiffs have also failed to establish that Officer Smith knew or should have known that his actions specifically endangered Leath. To satisfy this element, Plaintiffs "'must demonstrate that the state acted with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment.'" *McQueen v. Beecher Comm. Schs.*, 433 F.3d 460, 469 (6th Cir. 2006) (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002)). "In settings that provide the opportunity for self reflection and unhurried judgment," such as the setting Officer Smith faced when he left Leath in her parents' front yard, "[t]he guiding principle seems to be that a deliberate-indifference standard is appropriate." *Id.* (quotations omitted). Deliberate indifference is akin to subjective recklessness, "which means that the official must be both aware of facts from which the indifference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quotations omitted). The record is devoid of any fact that shows Officer Smith knew or should have known that Leath was subjected to harm.

First, Officer Smith had no way of knowing that Leath would leave her parents' residence. In fact, based on Leath's own representations and promises, Officer Smith was led to believe that Leath's parents were home, she would get inside the house with a spare key, and she would not stay out on the street. Second, there are no facts to suggest that Officer Smith knew Garcia would later choose to drive while intoxicated. Finally, and most importantly, there are no facts to suggest that Officer Smith knew or should have known that Leath would get in a vehicle with Garcia. Instead, based on the reports of the fight and Leath's representations during the ride to her parents' residence, Officer Smith was led to believe that Leath and Garcia were at odds. Garcia had previously pushed Leath to the ground, choked her and threatened to kill her. Garcia had also refused to give Leath the keys to her car. For each of these reasons, Officer Smith was not deliberately indifferent to the harm that killed Leath.

In an attempt to rebut this conclusion, Plaintiffs return to Officer Smith's oft-quoted statement to Leath that "I can't have you wandering out here on the street because you've been drinking" (*See id.* at 5:44:05 a.m.) as evidence that Officer Smith knew of the harm. But Plaintiffs' reliance on this statement is again misplaced. Officer Smith apparently recognized that Leath could be hurt if she was left to roam the streets. But that is not the harm that killed her: she was killed in a single-vehicle accident after choosing to ride with an intoxicated driver. This third prong of the state created danger exception requires Plaintiffs to prove that Officer Smith was deliberately indifferent to the harm that caused the injury. They have failed to satisfy this burden by demonstrating that Officer Smith was aware of some other unrelated harm.

## III. CONCLUSION

This is unquestionably a tragic case. However, construing the facts in the light most favorable to Plaintiffs, Officer Smith is not responsible for the tragedy. He did not violate Leath's substantive due process rights because he neither took Leath into custody such that he incurred the affirmative duty to care for her, nor did he leave her in a place of grave danger. Instead, he generously gave Leath a ride to her parents' residence and left her when he was assured she could get inside the home. Unfortunately, Leath was later killed after choosing to get in the vehicle with an intoxicated driver who wrecked into a tree. Officer Smith had nothing to do with this unforeseeable accident. Accordingly,

**IT IS ORDERED** as follows:

(1) Defendant Randall Smith's Motion for Summary Judgment (Doc. # 8) is hereby **GRANTED**;

(2) Pursuant to Federal Rule of Civil Procedure 56(f), Plaintiffs shall **file** a supplemental memorandum **on or before October 17, 2013**, showing cause why the Court should not enter judgment in favor of City of Knoxville and Officer Artymovich based on the Court's holding herein. Specifically, Plaintiffs shall address (1) whether the Court's holding on their deliberate indifference claim applies equally to Officer Artymovich and (2) whether the City of Knoxville can be liable under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978) if the Court concludes there is no underlying constitutional violation. Defendants may file a response **not later than October 31, 2013**, with any reply due **not later than November 14, 2013**.

This 25th day of September, 2013.



G:\DATA\Opinions\Knoxville\11-382 MOO granting MSJ.wpd